IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. _____

FILED by _____ D.C.

NOV 0 4 2009

STEVEN M. LARIMORE
CLERK U. S. DIST. CT
S. D. of FLA. – MIAMI

SEAMILES, LLC
a Florida limited liability company

**09 - 23382**

Plaintiff,

v.

CARNIVAL CORPORATION
f/k/a CARNIVAL CRUISE LINE, INC.,
a Panama Corporation,
BARCLAYS BANK DELAWARE, f/k/a
JUNIPER BANK, a Delaware corporation.

*CIV-UNGARO*

Defendants.

_____/

*MAGISTRATE JUDGE*
*SIMONTON*

## PLAINTIFF SEAMILES LLC'S EMERGENCY
## *EX PARTE* MOTION FOR TEMPORARY RESTRAINING ORDER AND
## PRELIMINARY INJUNCTION AND SUPPORTING MEMORANDUM OF LAW

Jorge Espinosa, Esq.
Florida Bar No.  779032
jespinosa@etlaw.com
Michael Tschupp, Esq.
mtschupp@etlaw.com
Florida Bar No. 34656
ESPINOSA|TRUEBA PL
3001 SW 3rd Ave.
Miami, Florida  33129
Tel:  305-773-3450
Fax:  305-285-5555

*Attorneys for Plaintiff*

Plaintiff, SEAMILES, LLC ("SeaMiles" or "Plaintiff"), pursuant to Rule 65 of the Federal Rules of Civil Procedure and the Court's inherent powers pursuant to the rules of equity, hereby moves on an emergency basis for the entry of a temporary restraining order and preliminary injunction enjoining Defendants, CARNIVAL CORPORATION ("Carnival") and BARCLAYS BANK DELAWARE f/k/a JUNIPER BANK ("Juniper") (collectively referred to as "Defendants"), from unlawfully disregarding the Agreements between the parties, from stealing SeaMiles' intellectual property, including but not limited to the SeaMiles Business Model, from tortiously interfering with SeaMiles' contracts and business relationships, and from engaging in unfair and deceptive trade practices in violation of Florida statute.

## I.       PRELIMINARY STATEMENT

This case recounts an old business story. The one about a little company with a great and novel idea who partners with large multinational corporations to create a platform on which to develop it, only to discover that when the idea proves to be a success, the larger companies conspire and collude to steal it. It is a story about ingratitude and the abuse of monetary might. SeaMiles' novel idea was to develop a cruise miles reward program credit card, which amongst its various features allowed SeaMiles to be redeemed with any cruise line, airline or hotel and provided for instant credit card approval aboard the vessel. SeaMiles joined with Defendants, Juniper and CCL to develop this program. The SeaMiles program has been a stunning success and has garnered over a hundred million dollars in direct and indirect revenues to the three companies. Now, like modern day pirates of the Caribbean, CCL and Juniper have colluded to plunder and steal the program and cut SeaMiles out of its modest share of this success. They have done so by secretly developing their own program that steals the SeaMiles Business Model, by soliciting SeaMiles personnel to go work for them and by violating the terms of the agreement they themselves designed. Fortunately for SeaMiles, despite its weak bargaining position against these giants of industry, it was able to obtain a contractual commitment that its intellectual property including the various elements of the SeaMiles Business Model, are and shall forever be the exclusive property of SeaMiles. Now SeaMiles turns to the Court to protect this bargained for right and to prevent the further infringement of its intellectual property. To that effect, SeaMiles has filed a Complaint for preliminary and permanent Injunctive Relief, Declaratory Judgment, Federal Trademark Infringement, Tortious Interference and other related counts

against Defendants[1]. Unless enjoined by the Court, Defendants' plan to issue their own card and to issue it to SeaMiles' customers as if it were a continuation of the SeaMiles card, will result in the theft of the goodwill in the SeaMiles' mark and the SeaMiles Business Model, thereby causing irreparable harm to SeaMiles' business and reputation.

## II.   STATEMENT OF FACTS

### A.   *SeaMiles and the SEAMILES® Mark*

SeaMiles is a Florida limited liability company with fewer than ten employees dedicated to promoting and marketing consumer products and services to cruise passengers. *Declaration of Peter Rooney*, attached hereto as *Exhibit A* at ¶3. SeaMiles is the owner of the intellectual property at issue in this case. *Id.*

In the early 2000's, SeaMiles developed a business model for a co-branded credit card between SeaMiles and a cruise line. *Id* at ¶4. Consumers could earn SeaMiles travel points which could be redeemed for cruise and travel credit with multiple cruise lines, airlines, and hotel stays or other travel rewards that SeaMiles offered. *Id.* This business model and its related revenue structure were unique in the industry at the time in several aspects: miles earned with the card could be redeemed on any cruise line, the credit card application was promoted and processed on board the vessel by SeaMiles personnel, and the credit card issuer approved or denied the credit application instantly (the "SeaMiles Business Model"). *Id* at ¶5.

In addition to the unique SeaMiles Business Model, SeaMiles also owns common law rights and federal trademark registrations in a word mark comprising the term SEA MILES®:

| Registered Mark | Registration No., Services and Date of Registration |
| --- | --- |
| SEA MILES | 2914829  (Consumer incentive program based on promoting the services of others, such services being retail of goods and services, cruise and air travel, hotel accommodations, and car rentals by awarding gift certificates) December 28, 2004 |
| SEA MILES | 3106933 (Financial affairs, namely credit card services) June 20, 2006 |
| SEA MILES | 3106935 (Promoting the sale of credit card accounts through the administration of incentive award and gift certificate programs; promoting the sale of the goods and services of others by awarding reward points and gift certificates) June 20, 2006 |

These registrations are valid and subsisting, unrevoked and in full force. This mark is referred to herein as the "SEAMILES® Mark".[2] *Id* at ¶6.

---

[1] SeaMiles' Complaint is filed simultaneously herewith.

At all times relevant to this action, SeaMiles owned all right, title and interest in the SEAMILES® Mark and associated goodwill. *Id* at ¶8. SeaMiles and/or its predecessors and licensees have been using the SEAMILES® Mark continuously in interstate commerce in relation to services related to the SeaMiles Business Model since at least as early as 2002, and have displayed the SEAMILES® Mark with the letter "R" enclosed within a circle or with the words "Reg. U.S. Pat & Tm. Off." or "Registered in U.S. Patent and Trademark Office". *Id.*

Over the many years that SeaMiles has used and licensed the SEAMILES® Mark, SeaMiles and their licensees have expended substantial sums in advertising and promotion through various media of its services under the mark. *Id* at ¶10. The SEAMILES® Mark has been prominently displayed in all of this advertising. *Id.* SeaMiles has carefully cultivated the SEAMILES® brand, ensuring that the services offered under the mark adhere to the highest standards of quality. *Id* at ¶11. Consequently, the SEAMILES® Mark has become widely known and accepted. *Id* at ¶9.

The SEAMILES® Mark has become famous as a result of these efforts, its distinctiveness, the duration and extent of its use in interstate commerce, the duration and extent of the advertising and publicity utilized to establish and support it, the geographical extent of the trading area in which it is used; the channels of trade for the services with which it is used; the degree of recognition of the SEAMILES® Mark in the trading areas and channels of trade in which it is used; the insubstantial — if not non-existent — nature and extent of the use of marks similar to the SEAMILES® Mark in connection with services offered by third parties; and the registration of the SEAMILES® Mark for services on the Principal Register. *Id* at ¶12.

### B.     The Defendants.

CCL operates one of the world's largest ocean cruise lines.  Together with its parent companies and affiliates, CCL's group of related companies controls approximately 60% of the international cruise market.  Headquartered in Miami, Florida, U.S.A. and London, England, CCL operates a fleet of 92 ships, with another 13 ships scheduled for delivery between now and 2012. There are an average of 225,000 people sailing aboard the CCL fleet at any given time, including approximately 65,000 shipboard employees.  Juniper is a Delaware bank and one of the largest issuers of credit cards in the country.  Juniper is part of Barclays PLC, a global British financial services firm operating on every continent except Antarctica. Barclays PLC was ranked

---

[2] The SEAMILES Mark® is also used internationally and is registered in the 27 countries of the European Union (European Reg. No. 2933661). *Id* at ¶7.

as the 25th largest company in the world by Forbes Global 2000 (2008 list) and the fourth largest financial services provider in the world by Tier 1 capital ($32.5 billion).

### C.   *The SeaMiles Business Model and the NDA*

In 2002, SeaMiles approached CCL with the idea of producing and marketing an ocean cruise travel reward credit card that followed the unique and novel SeaMiles Business Model. *Rooney* ¶14. CCL was very interested in the SeaMiles Business Model because it had previously participated in a CCL-only rewards card program through two different credit card issuers which were complete financial failures. *Id* at ¶15.

Under the SeaMiles Business Model:

    a.  The partner card issuer provides the credit cards and financing;

    b.  The partner cruise line would provide access to its vessels and customers;

    c.  SeaMiles would provide its brand and points earning and redemption program;

    d.  SeaMiles would promote the card and acquire new cardholders through an on-line website, magazine advertising, direct mail, trade shows and direct marketing on board the vessels;

    e.  SeaMiles would place personnel aboard the partner cruise lines' vessels to promote and sell the cards  (SeaMiles ended up doing this at its own expense and paying CCL for the travel expenses of SeaMiles sales personnel);

    f.  Credit application for potential card holders would be reviewed by the partner card issuer and approved instantly so that the consumer could immediately begin using the card and accumulating SeaMiles points;

    g.  SeaMiles points could be redeemed on any cruise line, not just the partner cruise line  (this remains the only cruise loyalty program in the industry that allows redemption on any cruise line hence the tag line for the SeaMiles credit card "Any Cruise Line Any Time®");

    h.  The cards would be co-branded by SeaMiles, the partner cruise line and the partner card issuer.

*Id* at ¶16.

In August 2002, in order to pursue these discussions in a confidential and safe business environment, CCL and SeaMiles entered into a Mutual Non-Disclosure Agreement (the "NDA"), prepared by CCL. *Id* at ¶17.The NDA prohibits disclosure **or use** of the confidential information

by the non-disclosing party. *Id* at ¶18. It defines sales methods and techniques, like the SeaMiles Business Model, as confidential information of the relevant party. *Id.* Furthermore, the NDA provides in paragraph 18 that the obligations contained in the agreement to not disclose **or use** this information shall "survive and continue in full force and effect . . . **indefinitely with respect to technical Confidential Information**" (emphasis added). *Id* at ¶19.

Throughout 2002 and 2003, SeaMiles circulated a request for proposal to various credit card issuers and eventually began to develop and document the financial arrangements for the issuance of a SeaMiles credit card with Bank One. *Id* at ¶20 .In 2004, SeaMiles approached Juniper to determine its interest in issuing the SeaMiles credit card[3]. Juniper was very interested in the SeaMiles Business Model, and particularly the instant credit component. *Id* at ¶21.After a substantial effort by Juniper to get the business, SeaMiles agreed to abandon its plans with Bank One and instead to go with Juniper. *Id.* CCL initially did not want to work with Juniper, then a relatively unknown credit card issuer. *Id* at ¶22. SeaMiles, through much effort, eventually persuaded CCL to accept Juniper as the issuer of the co-branded CCL-SeaMiles credit card. *Id* at ¶23.

### D.    *The Tri-Party Agreement*

The negotiations among CCL, Juniper and SeaMiles continued for several months and resulted in the execution of a Sea-Miles Co-Branded Credit Card Agreement among CCL, Juniper and SeaMiles dated November 24, 2004 (the "Tri-Party Agreement *Id* at ¶24.The Tri-Party Agreement recognizes in its second recital clause that SeaMiles is the "**creator, owner, and operator of the SeaMiles cruise and travel rewards program**" (emphasis added). *Id* at ¶25.

Paragraph 19 of the Tri-Party Agreement creates a bilateral non-compete restriction whereby CCL and SeaMiles agreed that neither of them shall:

> during the Term of this Agreement (including any renewal term) **and for a period of one (1) year following the termination of this Agreement** for any reason whatsoever, offer any co-branded credit card product to any CCL-SeaMiles or SeaMiles Generic Card holders, provided that nothing herein shall be construed to prevent CCL or SeaMiles from offering the Program, another credit card product or credit card product related product or service **if the offer did not include credit card membership as a criteria** in selecting the recipients of the offer.

(emphasis added). *Id* at ¶26.

---

[3]  All of the agreements refer to Juniper Bank which was subsequently renamed to Barclays. Accordingly, this entity is referred to as "Juniper" throughout this memorandum for the sake of clarity.

Pursuant to this non-compete clause, upon termination of the Tri-Party Agreement, SeaMiles and CCL can offer a rewards card to their members, but the new card cannot be co-branded with a credit card and credit card membership cannot be part of the criteria of membership. *Id* at ¶27.

### E.    The Two-Party Agreement

Despite the Tri-Party Agreement, CCL was concerned about having the ability to pursue other options should Juniper fail to properly support the program or, worse, try to circumvent CCL. *Id* at ¶28. Furthermore, SeaMiles agreed to share the revenues that it was receiving from Juniper with CCL in exchange for the exclusive protection of its SeaMiles Business Model and other intellectual property. *Id.* As a result, on July 28, 2005, CCL and SeaMiles executed a separate Co-Branded Credit Card Agreement (the "Two-Party Agreement"). *Id.*

The Two-Party Agreement, as between SeaMiles and CCL, incorporates and supersedes any inconsistent clauses in the Tri-Party Agreement (paragraph 2) and the NDA (paragraph 10.A). *Id* at ¶29 .As in the Tri-Party Agreement, the Two-Party Agreement, at the very outset, recognizes SeaMiles' ownership of the SeaMiles Business Model and program:

> WHEREAS, SeaMiles is the owner and operator of credit card/travel rewards programs desiring to enter into an agreement with CCL to offer and issue a co-branded SeaMiles-CCL credit card to qualifying U.S. resident consumers through a credit card issuing bank (hereinafter, the "Program," and as more fully described in Section 1.A below)

*Id* at ¶30.

The Program is then further defined in the Two-Party Agreement as:

> Under the Program, approved Card applicants (the "Card Member(s)") will earn travel reward points ("Points") by charging purchases to the Card, or by making balance transfers or other approved transactions in connection with the Card.  SeaMiles will enter into an agreement with Our Vacation Store, Inc. ("OVS" or the "Fulfillment Center") to serve as the travel fulfillment center to redeem cruises and other travel products in exchange for Card Member Points (the "Fulfillment Center Agreement").  Card Points shall be redeemable by Card Members in exchange for cruise vacations and other benefits, as mutually agreed upon by the Parties, subject to the Program's Card Points redemption platform ("Redemption Platform"), attached hereto as Exhibit C-1, attached and incorporated into this Agreement, as well as market and industry-related fluctuations.

*Id* at ¶31.

Paragraph 10.A of the Two-Party Agreement, which adopts the NDA, expands the coverage of the NDA by adding to the SeaMiles confidential information:

all of its trade secrets, know-how, business strategies, marketing information, technical information, **Program concept and other** proprietary **information of SeaMiles, including account and business information, business planning**, operations and objectives, cost and processing information…

(emphasis added). *Id* at ¶32.

A key term of the Two-Party Agreement was an acknowledgment by CCL in exchange for SeaMiles' promise to invest the capital required to make the CCL-SeaMiles co-branded card a success that the methodology, model and other elements of the program belonged exclusively to SeaMiles and could, therefore, not be appropriated by CCL.  This was memorialized in paragraph 14 which states:

> Notwithstanding any other provision in this Agreement to the contrary, the SeaMiles' Marks and all intellectual property rights, software copyrights, operational documentation, website content and code, **business models**, trade dress, formulas, **methodology, revenue models**, and all other creative and **conceptual aspects of the Program** developed by SeaMiles **are and shall always be deemed the exclusive property of SeaMiles**, except to the extent any such materials, or creative or conceptual aspects of the Program include all or a portion of any CCL Mark.

(emphasis added). *Id* at ¶33.

### F.    *Despite Success, Problems Arise through Defendants' Conduct*

In order to effectuate the various agreements between the parties, SeaMiles, at its own expense, placed salespersons on the CCL ships. *Id* at ¶34. Room and board was not provided on a complimentary basis by CCL.  *Id*.  In fact, SeaMiles bought guest cabins aboard the vessels for its salespeople to recruit customers for the program. *Id*. In other words, SeaMiles paid for all expenses incurred in recruiting new SeaMiles customers aboard the CCL ships. *Id*.

These salespersons would explain the program to passengers, would prepare the necessary forms to enroll new members in the program, and would seek instant credit approval from Juniper for those passengers who applied.  *Id* at ¶35. In addition, SeaMiles maintained an on-line site that promoted the program and signed up card holders.  *Id* at ¶36. The SeaMiles card was a huge success.  During the following years, consumers rang up billions of dollars of sales on the co-branded card, resulting in over $100 million in revenues to the parties. *Id* at ¶37.

In 2006 and 2007, problems surfaced when it was discovered that Juniper was:

    a.  Contacting other cruise lines regarding programs competitive with the SeaMiles Business Model in violation of the express and implied terms of the contracts between the parties.

     b.  Using the SeaMiles trademark and trade dress to promote the creation of competitive programs.

     c.  Shortchanging SeaMiles in its profit sharing calculation.

*Id* at ¶38. The parties entered and continue a process of negotiation and discussion regarding these issues. To this day, however, the profit sharing dispute remains unresolved. *Id* at ¶39.

On December 1, 2007, Juniper, CCL and SeaMiles executed a Second Amendment to the Tri-Party Agreement, and on December 7, 2007, Juniper and SeaMiles executed a Marketing Agreement.[4] *Id* at ¶40. These agreements came at the end of a year where SeaMiles almost sued Juniper for various contract violations involving improper discussions with third-parties as well money-related issues and where CCL participated with Juniper in violations of the exclusivity and confidentiality provisions of the Tri-Party Agreement. *Id*.

Unbeknownst to SeaMiles, Juniper and CCL subsequently began to negotiate their own scheme to get rid of SeaMiles and to steal its SeaMiles Business Model and card holders. In May of 2009, SeaMiles learned that CCL was approaching SeaMiles' personnel aboard vessels and soliciting them to go work for CCL. *Id* at ¶41. SeaMiles demanded that CCL cease such conduct. *Id* at ¶42.

### G.   *Termination Notice and Accusations of Breach*

On June 5, 2009, CCL notified Juniper and SeaMiles by a letter that was inexplicably dated June 12, 2009, that it intended to not renew the Tri-Party Agreement. *Id* at ¶43. On July 30, 2009, CCL sent SeaMiles a letter falsely claiming that SeaMiles was in default under the Two-Party Agreement. *Id* at ¶44. Over the following months, SeaMiles tried to work out a protocol for termination and transition which failed as it became increasingly obvious that CCL was planning to act in concert with Juniper and disregard SeaMiles' concerns. *Id* at ¶45.

On August 12, 2009, unbeknownst to SeaMiles, CCL registered the following Internet domain names: carnival-funpoints.com, carnival-funpoints.net, carnivalfun-points.com.carnivalfun-points.net, fun-points.net, carnivalfunpoint.com, carnivalfunpoint.net, carnivalfunpoints.com, carnivalfunpoints.net, mycarnivalfunpoints.com, fun-points.com, mycarnival-funpoints.com, mycarnival-funpoints.net, mycarnivalfunpoint.com, mycarnivalfunpoint.net, and mycarnivalfunpoints.net.[5] *Id* at ¶46.

---

[4] The Tri-Party Agreement was first amended earlier, but that amendment is not relevant to the present controversy.
[5] CCL has previously used Funpoints to identify a program for groups and not a credit card related rewards program.

The Tri-Party Agreement requires that a mutually agreed letter be sent to cardholders regarding termination. *Id* at ¶48. On or about October 9, 2009, CCL sent SeaMiles a proposed transition letter which showed that CCL and Juniper intended to appropriate to themselves all of the SeaMiles card holders, including those acquired exclusively by SeaMiles, to a new CCL/Juniper co-branded card. *Id.*

The CCL transition letter specifically stated:

> On December 15, 2009, the relationship between Carnival and SeaMiles will end.  As a result, your current card will be replaced with a new Carnival MasterCard with FunPoints. This will be a seamless transition for you:
> - **Your account number will remain the same**.
> - Your **unredeemed SeaMiles will be automatically converted to FunPoints** on your new Carnival MasterCard
> - You will continue to earn rewards on every purchase you make with your card.
>
> Plus, with your new Carnival MasterCard, you will be able to redeem your FunPoints for cruises, onboard gifts and air travel... The possibilities are endless!

(emphasis added). *Id* at ¶49. In subsequent communications with each of CCL and Juniper, they have repeatedly stated their intention upon termination to send this new CCL/Juniper co-branded card to the SeaMiles cardholders. *Id.*

This specifically violates CCL's commitment to refrain from offering a co-branded credit card program for a period of a year after termination. *Id* at ¶50. Moreover, this communication creates confusion in the minds of consumers as to the card since it creates the impression that Defendants' new card is the same as the SeaMiles card using the same points, numbers and members and merely changing the names. *Id* at ¶51.  By so doing, CCL and Juniper seek to steal the goodwill that the SeaMiles card has earned with the public.  *Id.* When SeaMiles reminded CCL and Juniper regarding their mutual obligations, counsel for Juniper indicated that he had been authorized by CCL to try to negotiate a solution between the parties.  *Id* at ¶52.  On numerous occasions, SeaMiles explained to CCL that these violations were unacceptable.  *Id* at ¶53. CCL and Juniper have refused to abandon their plans. *Id* at ¶54.

In particular, CCL and Juniper confirmed that they intend to convert all Carnival SeaMiles account holders to a CCL co-branded card.  *Id* at ¶55. CCL and Juniper have also indicated that they intend to solicit the full membership database including those customers acquired exclusively by  SeaMiles.  *Id* at ¶56. CCL has also refused to confirm that it will not steal the SeaMiles Business Model in violation of the Two-Party agreement and the NDA.  *Id* at

9

¶57. CCL has also refused to commit to the destruction of all of the co-branded promotional materials used aboard its vessels even though the old co-branded card is no longer being actively promoted. *Id* at ¶59.

Recently, SeaMiles discovered that Defendants are **using the internet domain name www.carnivalseamiles.com to redirect consumers to Juniper's website located at the URL https://www.barclaycardus.com/app/ccsite/action/home**. *Id* at ¶60. According to the public WHOIS database, the carnivalseamiles.com domain is owned and controlled by CCL. *Id* at ¶61. Once on the Juniper web site, CCL and Juniper promote Defendants' new Carnival "FunPoints" co-branded card in connection with a description of the current SeaMiles co-branded card, as shown in *Exhibit B*, thereby creating the impression in consumers' minds that it is a mere continuation of the SeaMiles program and that the programs are one and the same. *Id* at ¶62.

### H. *Immediate Threats of Irreparable Harm*

Based on Defendants' prior representations, SeaMiles believes that CCL and Juniper will send, without SeaMiles' required approval, a communication similar to the one above to SeaMiles cardholders within a matter of days in order to prepare to issue their new unauthorized cards on December 15. *Id* at ¶64. The fact that SeaMiles personnel are now removed or in the process of being removed from CCL's vessels, increases the risk that CCL will immediately start promoting the unauthorized card aboard its vessels. *Id* at ¶65. SeaMiles likewise believes that Juniper and CCL are likely to continue to engage in increasingly visible and material public steps in anticipation of the launch of their new unauthorized co-branded card, and that such steps will escalate within the coming days. *Id* at ¶66. SeaMiles knows that the unauthorized use of the carnivalseamiles.com domain to point at the web pages containing the images of the new unauthorized CCL/Juniper cards continues and is likely to continue, and believes that such use will escalate within the coming days. *Id* at ¶67. SeaMiles faces immediate and irreparable harm as a result of Defendants' wrongful activities. *Id* at ¶63.

## II.     ARGUMENT

### A. SEAMILES IS ENTITLED TO A PRELIMINARY INJUNCTION AGAINST THE DEFENDANTS ON VARIOUS GROUNDS AND FOR VARIOUS WRONGFUL CONDUCT

The Eleventh Circuit has noted that in trademark infringement actions, injunctive relief is "the order of the day," *SunAmerica Corp. v. Sun Life Assur. Co. of Canada*, 77 F.3d 1325, 1336 (11th Cir. 1996), since it helps to prevent continuing injury to the trademark owner and to

the public. A party seeking a preliminary injunction must only show "(1) a substantial likelihood of success on the merits of the underlying case, (2) the movant will suffer irreparable harm in the absence of an injunction, (3) [that] the harm suffered by the movant in the absence of an injunction would exceed the harm suffered by the opposing party if the injunction issued, and (4) [that] an injunction would not disserve the public interest." *N. Am Med. Corp v. Axiom Worldwide, Inc.*, 522 F.3d 1211 (11th Cir. Apr. 7, 2008); *see also McDonald's Corp. v. Robertson,* 147 F.3d 1301, 1306 (11th Cir. 1998).

As more fully set forth below, SeaMiles meets each of the requirements necessary to obtain injunctive relief against Defendants. Unless this Court enjoins Defendants from the various violations discussed herein, SeaMiles will suffer damages including loss of market share, and damages to its goodwill and reputation. Moreover, to the extent that the Defendants are allowed to steal SeaMiles' intellectual property and its unique business model, they may completely destroy SeaMiles' business.

The conduct that needs to be enjoined can be characterized as follows: First, Defendants need to be enjoined from using SeaMiles' registered trademark to advertise their unauthorized co-branded FunPoints card; second, Defendants need to be enjoined from employing the SeaMiles Business Model in their own venture and from offering their new co-branded card; third, Defendants need to be enjoined from soliciting customers that were acquired exclusively by SeaMiles; and fourth, CCL needs to be enjoined from soliciting SeaMiles' personnel to accept employment with CCL.

### 1. Plaintiff has a Strong Likelihood of Success on the Merits

***i. SeaMiles is entitled to a preliminary injunction enjoining Defendants from further infringement of the SeaMiles trademark or the continued theft of the mark's goodwill under theories of federal trademark infringement, unfair competition and trademark dilution***

SeaMiles is the owner of three federal trademark registrations for the SEAMILES® Mark. Without SeaMiles's authority, CCL has been using a domain that contains the SEAMILES® Mark, www.carnivalseamiles.com, to redirect prospective card holders and current card holders to a site operated by Juniper in which the SEAMILES® Mark is further used to advertise their new, unauthorized FunPoints card. The injury is rendered far worse since Defendants are issuing this card in violation of the Two Party Agreement and in an effort to steal the proprietary SeaMiles Business Model.

11

To prevail on a claim of trademark infringement under Section 32 of the Lanham Act, a plaintiff must demonstrate that:

> it possess[es] a valid mark, (2) that the defendants used the mark, (3) that the defendants' use of the mark occurred "in commerce," (4) that the defendants used the mark "in connection with the sale ... or advertising of any goods," and (5) that the defendants used the mark in a manner likely to confuse consumers.

*N. Am Med. Corp v. Axiom Worldwide, Inc.,* 522 F.3d 1211, 1218 (11th Cir. 2008).

The analysis of these elements in this case is relatively simple compared to other trademark cases because many factors are not or should not be in dispute given the facts. The validity of the SEAMILES® Mark is demonstrated by its registry on the Principal Register.  It can hardly be denied that Defendants use of the SEAMILES® Mark in the web domain and related web site to offer their new co-branded card constitutes use of the mark in commerce. When a licensee exceeds the scope of his trademark license, he infringes the licensor's trademark. *Four Seasons Hotels & Resorts B.V. v. Consorcio Barr, S.A.,* 267 F. Supp. 2d 1268 (S.D. Fla. 2003), therefore Defendants cannot take refuge in the limited authorization they have to use the SEAMILES® Mark because this use exceeds that authorization.

The analysis of the final factor, likelihood of confusion, leads to a similar conclusion.  At the outset, it should be noted that unauthorized use by a licensee or a former licensee, as here, is particularly egregious and likely to confuse because Defendants are already associated with SeaMiles in the mind of the consumer. *Fido's Fences Inc. v. Canine Fence Co.,* 309 Fed. Appx. 480, 482 (2d Cir. N.Y. 2009).  With this in mind, we turn to the Eleventh Circuit's seven-factor test for likelihood of confusion:

> (1) the strength of the plaintiff's mark, (2) the similarity between the plaintiff's mark and the allegedly infringing mark; (3) the similarity between the products and services offered by the plaintiff and defendant; (4) the similarity of the sales methods; (5) the similarity of the advertising methods; (6) the defendant's intent ...; and (7) actual confusion.

*Axiom,* 522 F.3d at 1221.

Six of these factors weigh in favor of SeaMiles, which is more than enough to conclude that SeaMiles is likely to prevail on its trademark infringement claim. *Cartier v. Aaron Faber, Inc.,* 396 F. Supp. 2d 356, 359 (S.D.N.Y. 2005) (holding that "[t]he Court need not consider in great depth the individual [likelihood of confusion] factors, as the [infringing goods] clearly create a likelihood of confusion."). Given that Defendants have profited enormously through the

12

credit card program co-branded with the SEAMILES® Mark, it would be strange indeed if they disputed that the first factor weighs in favor of a finding of likelihood of confusion.

The second, third, fourth, and fifth factors all weigh in favor of a finding of likelihood of confusion because Defendants are employing a mark identical to the SEAMILES® mark to offer services based on the SeaMiles Business Model to the same target market as SeaMiles through the medium of the Internet, which is also used by SeaMiles. The sixth factor also weighs in favor of SeaMiles because Defendants' bad intent is demonstrated by the steps they have taken to circumvent SeaMiles as well as to misappropriate its goodwill, business model, and even its personnel.

Although SeaMiles is still investigating instances of "actual confusion," it is not required to produce such elements to obtain a preliminary injunction or ultimately prevail on its claims. *See Babbit Elecs.*, 38 F.3d at 1179 (quoting *Jaguar Cars Ltd.*, 771 F. Supp. at 1184 (citing *E. Remy Martin & Co.*, 756 F.2d at 1529)). SeaMiles anticipates that consumer confusion has occurred, however, nowhere near the level of confusion that will be caused if the Defendants are allowed to proceed with their mailing to SeaMiles card holders and their intended launch of their new co-branded credit card in violation of their contractual obligations. The overwhelming weight of the above factors indicates that confusion is likely and that SeaMiles is likely to prevail on its trademark infringement claim.

For the same reasons, SeaMiles is also likely to prevail on its claims for Federal and common law unfair competition. *See Chanel, Inc. v. Italian Activewear of Fla., Inc.*, 931 F.2d 1472, 1475 n. 3 (11th Cir. 1991).

On its dilution count, SeaMiles must prove four facts to prevail: "1) its mark is famous; 2) the defendant adopted its mark after the plaintiff's mark became famous; 3) the defendant's mark diluted the plaintiff's mark; and 4) the defendant's use is commercial and in commerce." *Carnival Corp. v. SeaEscape Casino Cruises, Inc.*, 74 F. Supp. 2d 1261 (S.D. Fla.1999). As to the first element, the inquiry under Eleventh Circuit law largely mirrors the inquiry into likelihood of confusion discussed above. A court can consider any factors it wishes. The non-exclusive list factors in 15 U.S.C. § 1125(c)(1) include:

> (1) the degree of inherent or acquired distinctiveness; (2) the duration and extent of use of the mark; (3) the duration and extent of advertising and publicity; (4) the geographical extent of the area in which the mark is used; (5) the channels of trade in which the mark is used; (6) the degree of recognition of the mark in the areas and channels of trade used by the owner and the entity allegedly diluting the

mark; and (7) the nature and extent of use of the same or similar marks by third parties; and (8) whether the mark is registered on the principal register.

When the facts set forth in the memorandum are applied to these factors, the extensive use, marketing, and recognition of the SEAMILES® Mark support the conclusion that the mark is famous.

The second, third and fourth elements should not be in serious dispute. "Adoption" in this context means the commencement of use that is not authorized. *See Papa John's Int'l, Inc. v. Rezko*, 446 F. Supp. 2d 801, 809 (N.D. Ill. 2006). Otherwise, a licensee or former licensee could often evade the dilution law. Defendants' adoption of an identical mark, as properly understood, occurred just recently. Therefore, if the Court finds that the SEAMILES® Mark is famous, it follows that it must also find that any recent adoption by Defendants occurred after the mark became famous. Nor should it be seriously questioned, turning to the third element, whether Defendants use of SeaMiles' mark to promote their unauthorized competitive service is dilutive of the SEAMILES Mark®. As discussed above in the context of the infringement claim, the fourth element, use in commerce, should not be in dispute. SeaMiles is likely to prevail on its dilution claim.

### ii. SeaMiles is entitled to a preliminary injunction enjoining CCL from copying, stealing, imitating or implementing, without authority, the SeaMiles Business Model

In exchange for the execution of the Two-Party Agreement and the additional funds which would go to CCL under that agreement, CCL recognized that the SeaMiles Business Model was permanently the exclusive property of SeaMiles. The Two Party Agreement recognizes that the SeaMiles Business Model consists of:

> credit card/travel rewards programs...[in which]...approved Card applicants … earn travel reward points ("Points") by charging purchases to the Card, or by making balance transfers or other approved transactions in connection with the Card...[which]...shall be redeemable by Card Members in exchange for cruise vacations and other benefits

The Two Party Agreement further recognizes that CCL has, as a material condition for inducing SeaMiles to enter into the Agreement, forever given SeaMiles the exclusive right and ownership to its business model:

> Notwithstanding any other provision in this Agreement to the contrary, the SeaMiles' Marks and all intellectual property rights, software copyrights, operational documentation, website content and code, business models, trade

14

dress, formulas, methodology, revenue models, and all other creative and conceptual aspects of the Program developed by SeaMiles are and shall always be deemed the exclusive property of SeaMiles, except to the extent any such materials, or creative or conceptual aspects of the Program include all or a portion of any CCL Mark.

By trying to launch and operate its own co-branded credit card with a cruise reward component, CCL is stealing and infringing what it agreed would be SeaMiles' exclusive property. Although CCL may offer a Carnival Rewards Card to its customers, such a card cannot be co-branded, cannot be redeemed on other cruise lines and cannot copy the other unique elements of the SeaMiles Business Model.[6] If CCL breaches this contractual obligation, SeaMiles will be irreparably harmed.

### iii. Seamiles is entitled to a preliminary injunction enjoining CCL from tortiously interfering in its contractual relationships with its personnel

SeaMiles has contractual relationships with its salespeople. SeaMiles has to pay for cabins in which to house its salespeople aboard the CCL vessels. These salespeople then solicit customers for the SeaMiles credit card program, process their applications and set them up with instant credit approval or rejection. The cardholders which SeaMiles recruits then generate revenues for SeaMiles, Juniper and CCL. In anticipation of their scheme to steal the SeaMiles Business Model and to divert SeaMiles' hard earned goodwill, CCL had been soliciting SeaMiles personnel to quit and go to work for CCL without justification or privilege. CCL's tortious interference with SeaMiles personnel relationships also constitutes a violation of the covenant of good faith and fair dealing which is inherent in contractual relationships.

### iv. SeaMiles is entitled to a preliminary injunction enjoining Juniper from tortiously interfering in its relationship with CCL or in assisting CCL to breach its obligations under the Two-Party Agreement

Juniper is aware that that CCL has signed a Two-Party Agreement with SeaMiles which, as between CCL and SeaMiles, irrevocably recognizes SeaMiles' exclusive rights to the SeaMiles intellectual property, including the SeaMiles Business Model. Nevertheless, Juniper has actively conspired and assisted CCL in breaching this Agreement. These steps have taken such obvious and blatant forms as infringing the SEAMILES® Mark for the purpose of redirecting potential and current cardholders to a site showing the Defendants unauthorized FunPoints card and more subtle ones such as the secret development of the new program during

---

[6] SeaMiles recognizes that there is no patent registration for the SeaMiles Business Model and that unrelated third parties may be able to copy elements of the Business Model. The issue in this case relates to a specific contractual obligation assumed by CCL which is integral to and survives the termination of the Two-Party Agreement.

the past several months. Juniper's interference has facilitated and potentially induced CCL to commit a breach that they might not have otherwise done.

### 2.   Defendants' Misconduct Continues To Cause Irreparable Harm to SeaMiles

The second requirement for obtaining a preliminary injunction is proving irreparable injury. Whether or not an injury is considered "irreparable" depends upon whether there is a legal remedy available. If not, an injunction is the only mode of enforcement for the alleged wrong. *See Jewett Orthopedic Clinic, P.A. v. White*, 629 So. 2d 922, 927 (Fla. 5th DCA 1993).

"[G]rounds for irreparable injury include loss of control of reputation, loss of trade, and loss of goodwill. *Ferrellgas Ptnrs., L.P. v. Barrow*, 143 Fed. Appx. 180 (11th Cir. 2005). "Irreparable injury can also be based upon the possibility of confusion." *Pappan Enters., Inc. v. Hardee's Food Sys., Inc.*, 143 F.3d 800, 805 (3d Cir. 1998) (citing *Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 196 (3d Cir. 1990)(holding that the lack of control over one's mark "creates the *potential* for damage to . . . reputation[, which] constitutes irreparable injury for the purpose of granting a preliminary injunction in a trademark case.")); *Power Test Petroleum Distributors, Inc. v. Calcu Gas, Inc.*, 754 F.2d 91, 95 (2d Cir. 1985)(holding that irreparable injury "exists in a trademark case when the party seeking the injunction shows that it will lose control over the reputation of its trademark pending trial."). "The most corrosive and irreparable harm attributable to trademark infringement is the inability of the victim to control the nature and quality of the defendants' goods. Even if the infringer's products are of high quality, the plaintiff can properly insist that its reputation should not be imperiled by the acts of another." *Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1092 (7th Cir. 1988)(citation omitted). A plaintiff need not show that the infringer acted in such a way as to damage the reputation of the plaintiff. It is the loss of control of one's reputation by the adoption of a confusingly similar mark that supplies the substantial threat of irreparable harm.

In trademark infringement actions, injunctive relief is appropriate because "(1) there is no adequate remedy at law to redress infringement and (2) **infringement by its nature causes irreparable harm.**" *Tally-Ho, Inc. v. Coast Cmty. Coll. Dist.*, 889 F.2d 1018, 1029 (11th Cir. 1989)(emphasis added). Proof of objective damage is not even necessary at this stage. "A plaintiff need not show that the infringer acted in such a way as to damage the reputation of the plaintiff. It is the loss of control of one's reputation by the adoption of a confusingly similar mark that supplies the substantial threat of irreparable harm." *Ferrellgas Partners, L.P. v. Barrow*, 143 Fed. Appx. 180, 190-91 (11th Cir. 2005). Indeed, "the most corrosive and irreparable harm

16

attributable to trademark infringement [is] the inability of the victim to control the nature and quality of the defendants' goods. Even if the infringer's products are of high quality, the plaintiff can properly insist that its reputation should not be imperiled by the acts of another." *Id.* *(quoting Club of Chicago, Inc. v. Mighty Star, Inc.,* 846 F.2d 1079, 1092 (7th Cir. 1988) (citation omitted)).

The danger described in *Ferrelgas* applies with equal force to the trademark infringement aspects of this motion as they do to the material contractual rights to the SeaMiles Business Model that CCL surrendered to SeaMiles in its arm length contract.  Defendants are trying to replace the SeaMiles program with their own program, which is barred by contract, and do so by illegally using SEAMILES® Mark in a manner which deceives the consumer into believing that they are continuing the same program.  To the extent that the consumer is relying on this travel reward aspects of the program, they are cheated of these benefits, and value is taken from them without their knowledge since the points that they have accumulated may not be redeemable with non-CCL cruise lines, airlines or hotels.   This to the complete detriment to the goodwill in the SEAMILES® Mark.   In this case it is not just the trademark, but the commercial viability of the very underlying contractually protected SeaMiles Business Model, that is threatened.

Here, SeaMiles has no adequate remedy at law.  Unlike the Defendants which are rich and powerful multinational corporations, SeaMiles has very limited assets: its intellectual property, its novel SeaMiles Business Model, and its customer list.  These are the assets that CCL and Juniper have set out to steal.  If SeaMiles card holders are led to believe that the Defendants' illegal new FunPoints card is the same card and provides the unique SeaMiles Business Model, they are likely to transfer their business.  Once SeaMiles' goodwill has been undermined and its cardholder base dissipated, SeaMiles will be effectively destroyed as a business.

Clearly, a monetary award against Defendants cannot remedy the loss of business opportunity or market share that SeaMiles will surely suffer.  *See DeRitis v. AHZ Corp.*, 444 So. 2d 93, 94-95 (Fla. 4th DCA 1984) (irreparable injury established where damages were estimable only by conjecture); see also *Grant v. Robert Half Intern., Inc.*, 597 So. 2d 801, 801-02 (Fla. 3d DCA 1992) (affirming order granting temporary injunction where former employer demonstrated irreparable harm due to former employee's solicitation of former employer's clients, as well as injury to former employer's goodwill and business reputation); *Miller Mechanical, Inc. v. Ruth*, 300 So. 2d 11, 12 (Fla. 1974) ("The Court may award damages for breach of contract but the

normal remedy is to grant an injunction....This is so because of the inherently difficulty, although not impossible, task of determining just what damage actually is caused by the … breach of the agreement.").

This theft of goodwill and of the proprietary SeaMiles Business Model are being facilitated if not outright instigated by Juniper. Juniper is infringing the SeaMiles trademark and participating in the redirection of card holders looking for the carnivalseamiles site to the FunPoints card on the Juniper site. Juniper's tortious interference with the Two-Party Agreement and CCL's interference in the SeaMiles employee relationships, taken together, are a blatant cold and calculated two pronged attack on SeaMiles, its customer goodwill, and its ability to exploit its proprietary SeaMiles Business Model.

Here, money damages cannot wholly compensate SeaMiles for its injuries because the injuries involve incalculable harm to SeaMiles goodwill, reputation and relationship with present and prospective customers. Therefore, the damage to SeaMiles reputation and customer base is clearly irreparable. Thus the second element is satisfied. Based on the foregoing, this factor favors the issuance of a preliminary injunction.

### 3. The Threatened Injury to SeaMiles Clearly Outweighs the Possible Harm to CCL or Juniper From The Issuance Of An Injunction

Denying SeaMiles' application for injunctive relief will clearly harm SeaMiles more than the granting of such injunction would harm Defendants. As a culmination of the investment made by SeaMiles of substantial time, money, and other resources, SeaMiles has established an important customer base and market share in the cruise rewards industry. This investment, a difficult and expensive one for such a small start-up company will be squandered if the program is stolen by CCL and Juniper.

By contrast, CCL and Juniper are parts of giant international conglomerates in their respective fields. As profitable as the SeaMiles program has been, it forms a miniscule part of their revenue. Although the relative smallness of the bounty has not dissuaded their greed, Juniper and CCL could easily forego the program. Juniper hosts numerous other incentive card programs outside of the travel miles field. In fact, within the cruise miles business, Juniper hosts co-branded card program with Holland America. Likewise, CCL and its related companies control 60% of the international cruise market. It could easily arrange a non-co-branded card to provide shipboard services to its clients without the co-branded/credit card components that it negotiated away to SeaMiles.

The bottom line is that the cost of denying this preliminary injunction to SeaMiles is survival. The cost to Juniper and CCL is money and, relative to their size and wealth, sustainable losses. Accordingly, SeaMiles has established the third element for obtaining a preliminary injunction against Defendants.

### 4.      The Public Interest Weighs Heavily in SeaMiles' Favor

The fourth and final requirement for obtaining a preliminary injunction is proving that the granting of the injunction would not be adverse to the public interest. "In a trademark infringement or unfair competition case, a third party, the consuming public is present and its interests are paramount." *BellSouth Adver. & Publ'g Corp. v. Real Color Pages, Inc.*, 792 F. Supp. 775, 785 (M.D. Fla. 1991). A preliminary injunction would serve the public interest by protecting consumers from being misled and confused as to the nature of the services offered under the new card and as to the origin of the new card. Furthermore, the public has an interest in the enforcement of private contracts and in discouraging interference with such contracts. There is absolutely no public interest that does not dictate for entry of a preliminary injunction. Based on the foregoing, this factor also favors the issuance of a preliminary injunction.

### V.      A TEMPORARY RESTRAINING ORDER IS NECESSARY

SeaMiles is entitled to a temporary restraining order if it will be "immediately and irreparably" harmed by Defendants' wrongful acts before the Court can conduct a hearing on SeaMiles' Motion for a Preliminary Injunction. F.R.C.P. 65(d). Additionally, SeaMiles must show, at least on a preliminary basis, that the four factors required for a preliminary injunction, already discussed above, are satisfied. *Schiavo v. Schiavo*, 403 F.3d 1223, 1225-26 (11th Cir. 2005); *see also Axiom Worldwide, Inc.*, 522 F.3d at 1217.

Defendants are likely to send a letter similar to their proposed transition letter before SeaMiles' motion for preliminary injunction can be fully briefed and heard causing sever irreparable harm to SeaMiles. In addition, Defendants are continuing and will further escalate their other wrongful acts in the leadup to the launch of their unauthorized card, causing further irreparable harm to SeaMiles.

As described above, SeaMiles has made the necessary showing on the four elements of injunctive relief. If anything, the third factor, balance of hardships, weighs even more heavily in favor of SeaMiles in the context of a temporary restraining order because the harm to Defendants posed by a short-term restraint is less than that of a preliminary injunction, while the threat of catastrophic injury to SeaMiles if relief is denied remains the same. Under the circumstances,

the issuance of a temporary restraining order is both appropriate and necessary to preserve the *status quo* between the parties.

## V.      NO BOND SHOULD BE REQUIRED

This is a case where the relief which is requested is merely asking that Defendants not infringe a mark, not to breach a contract and not to tortiously interfere with contractual relations. Defendants have various options for continuing the program in its present form or for alternative arrangements which will present no substantial expense.  As a result, there is no imposition on the Defendants' overall business, particularly in the context of the substantial economic superiority of the Defendants.    As a result, and in view of the egregious nature of the alleged violations, little or no bond should be required.

## VI.     CONCLUSION

Judicial redress is necessary to remedy CCL and Juniper's misconduct. Defendants have and continue to infringe the SeaMiles mark and to plunder SeaMiles' hard-earned goodwill.  As a direct and proximate result of Defendants' unlawful conduct and their continued efforts to steal customers, personnel, business models, and overall goodwill, SeaMiles will suffer irreparable harm to its reputation, to existing and future market share, and to its customer base.  This Court should temporarily restrain and preliminarily enjoin Defendants from: (a) Employing the SeaMiles Business Model or any similar business model, including the offering of a co-branded travel rewards card; (b) infringing the SEAMILES® Mark; (c) Sending to the card holders of the CCL-SeaMiles co-branded card any communication not approved by SeaMiles; (d) Falsely suggesting any connection between their services and SeaMiles; (e) Unfairly competing with SeaMiles; (e) Conditioning any business dealings with others upon their refusal to deal with SeaMiles; (f) Tortiously interfering with SeaMiles' contracts or business relationships; (f) Using or disclosing SeaMiles' proprietary and confidential business information; (g) Soliciting any of SeaMiles' personnel for employment with Defendants; (h) Making any statements which disparage SeaMiles or SeaMiles' services; (i) Soliciting any of SeaMiles' personnel for employment with Defendants.  The Court should also require Defendants to surrender any printed materials bearing the SEAMILES® Mark for destruction, and should order such other and further relief as may be just and equitable.[7]

---

[7] Should the Court deny SeaMiles' request for a temporary restraining order, SeaMiles requests that its motion for preliminary injunction be briefed and heard on an expedited emergency basis to limit the extent of the harm to it.

Dated:  November **4**, 2009

Respectfully submitted,

By: _____

Jorge Espinosa, Esq.
Florida Bar No.  779032
Jespinosa@etlaw.com
Michael Tschupp, Esq.
Florida Bar No. 34656
ESPINOSA|TRUEBA PL
3001 SW 3rd Ave.
Miami, Florida  33129
Tel:  305-773-3450
Fax:  305-285-5555

*Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. _____

SEAMILES, LLC
a Florida limited liability company,

      Plaintiff,

v.

CARNIVAL CORPORATION
f/k/a CARNIVAL CRUISE LINE, INC.,
a Panama Corporation,
BARCLAYS BANK DELAWARE, f/k/a
JUNIPER BANK, a Delaware corporation.

      Defendants.

_____/

## DECLARATION OF PETER ROONEY

I, Peter Rooney, hereby state as my declaration:

1.      My name is Peter Rooney and I am over the age of eighteen and have personal knowledge of the facts stated herein.

2.      I am President of SeaMiles, LLC ("SeaMiles"), the Plaintiff in this case.

3.      SeaMiles is a Florida limited liability company with fewer than ten employees dedicated to promoting and marketing consumer products and services to cruise passengers. SeaMiles is the owner of the intellectual property at issue in this case.

4.      In the early 2000's, SeaMiles developed a business model for a co-branded credit card between SeaMiles and a cruise line. Consumers could earn travel SeaMiles points which could be redeemed for cruise and travel credit with any cruise line, airline, hotel, or for other travel rewards that SeaMiles offered.

5.      This business model and its related revenue structure were unique in the industry



at the time in several aspects: miles earned with the card could be redeemed on any cruise line, the credit card application was promoted and processed on board the vessel by SeaMiles personnel, and the credit card issuer approved or denied the credit application instantly (the "SeaMiles Business Model").

6.     SeaMiles is also the owner of common law rights and federal trademark registrations in a word mark comprising the term SEA MILES®:

| Registered Mark | Registration No., Services and Date of Registration |
|---|---|
| SEA MILES | 2914829  (Consumer incentive program based on promoting the services of others, such services being retail of goods and services, cruise and air travel, hotel accommodations, and car rentals by awarding gift certificates) December 28, 2004 |
| SEA MILES | 3106933 (Financial affairs, namely credit card services) June 20, 2006 |
| SEA MILES | 3106935 (Promoting the sale of credit card accounts through the administration of incentive award and gift certificate programs; promoting the sale of the goods and services of others by awarding reward points and gift certificates) June 20, 2006 |

These registrations are valid and subsisting, unrevoked and uncancelled.  This mark is referred to herein as the "SEAMILES® Mark".

7.     The SEAMILES Mark® is also used internationally and is registered in the European Union (European Reg. No. 2933661).

8.     At all times relevant to this action, SeaMiles owned all right, title and interest in the SEAMILES® Mark and associated goodwill.  SeaMiles and/or its predecessors and licensees have been using the SEAMILES® Mark continuously in interstate commerce in relation to services related to the SeaMiles Business Model since at least as early as 2002, and have displayed the SEAMILES® Mark with the letter "R" enclosed within a circle or with the words

"Reg. U.S. Pat & Tm. Off." or "Registered in U.S. Patent and Trademark Office".

9.     SeaMiles and its licensees have spent significant sums of money advertising, promoting, and offering services featuring the SEAMILES® Mark over the years, creating a consumer demand for such services throughout the United States and abroad. Consequently, the SEAMILES® Mark has become widely known and accepted.

10.     Over the many years that SeaMiles has used and licensed the SEAMILES® Mark, SeaMiles and their licensees have expended substantial sums in advertising and promotion through various media of its services under the mark. The SEAMILES® Mark has been prominently displayed in all of this advertising.

11.     SeaMiles has carefully cultivated the SEAMILES® brand, ensuring that the services offered under the mark adhere to the highest standards of quality.

12.     The SEAMILES® Mark has become famous as a result of its distinctiveness; the duration and extent of its use in interstate commerce; the duration and extent of the advertising and publicity utilized to establish and support it; the geographical extent of the trading area in which it is used; the channels of trade for the services with which it is used; the degree of recognition of the SEAMILES® Mark in the trading areas and channels of trade in which it is used; the insubstantial — if not non-existent — nature and extent of use of marks similar to the SEAMILES® Mark in connection with services offered by third parties; and the registration of the SEAMILES® Mark for services on the Principal Register.

13.     As a result of this long and continuous use, the SEAMILES® Mark has come to identify services associated with SeaMiles and distinguish them from those of others, and has come to represent and symbolize to the consumer that the services in connection with which the SEAMILES® Mark appears adhere to standards of the highest quality. As a result, SeaMiles has

established substantial goodwill in the SeaMiles® Mark, which is now a valuable asset of SeaMiles.

14.     In 2002, SeaMiles approached Carnival Cruise Line ("CCL") with the idea of producing and marketing an ocean cruise travel reward card that followed the unique and novel SeaMiles Business Model.

15.     CCL was very interested in the SeaMiles Business Model because it had previously participated in a CCL-only rewards card program through two different credit card issuers which were complete financial failures.

16.     Under the SeaMiles Business Model:

    a.   The partner card issuer provides the credit cards and financing;

    b.   The partner cruise line would provide access to its vessels and customers;

    c.   SeaMiles would provide its brand and points earning and redemption program;

    d.   SeaMiles would promote the card and obtain new cardholders through an on-line website, magazine advertising, direct mail, trade shows and on board the vessels;

    e.   SeaMiles would place personnel aboard the partner cruise lines' vessels to promote and sell the cards  (SeaMiles ended up doing this at its own expense and paying CCL for the travel expenses of SeaMiles sales personnel);

    f.   Credit application for potential card holders would be reviewed by the partner card issuer and approved instantly so that the consumer could immediately begin using the card and accumulating SeaMiles points;

g.  SeaMiles points could be redeemed on any cruise line, not just the partner cruise line  (this remains the only cruise loyalty program in the industry that allows redemption on any cruise line hence the tag line for the SeaMiles credit card "Any Cruise Line Any Time®");

h.  The cards would be co-branded by SeaMiles, the partner cruise line and the partner card issuer.

17.     In August 2002, in order to pursue these discussions in a confidential and safe business environment, CCL and SeaMiles entered into a Mutual Non-Disclosure Agreement (the "NDA"), prepared by CCL.

18.     The NDA prohibits disclosure **or use** of the confidential information by the non-disclosing party.  It defines sales methods and techniques, like the SeaMiles Business Model, as confidential information of each party.

19.     Furthermore, the NDA provides in paragraph 18 that the obligations contained in the agreement to not disclose **or use** this information shall "survive and continue in full force and effect **. . . indefinitely with respect to technical Confidential Information**"  (emphasis added).

20.     Throughout 2002 and 2003, SeaMiles circulated a request for proposal to various credit card issuers and eventually began to develop and document the financial arrangements for the issuance of a SeaMiles credit card with Bank One.

21.     In 2004, SeaMiles approached Juniper Bank, now part of Barclays Bank Delaware ("Juniper")[1], to determine its interest in issuing the SeaMiles credit card.  Juniper was very interested in the SeaMiles Business Model, and particularly the instant credit component. After a substantial effort by Juniper to get the business, SeaMiles agreed to abandon its plans

---

[1]  All of the agreements refer to Juniper Bank which was subsequently renamed to Barclays.  Accordingly, this entity is referred to as "Juniper" for the sake of clarity.

with Bank One and instead to go with Juniper.

22.    CCL initially did not want to work with Juniper, then a relative unknown credit card issuer.

23.    SeaMiles, through much effort, eventually persuaded CCL to accept Juniper as the issuer of the co-branded CCL-SeaMiles credit card.

24.    The negotiations among CCL, Juniper and SeaMiles continued for several months and resulted in the execution of a Sea-Miles Co-Branded Credit Card Agreement among CCL, Juniper and SeaMiles dated November 24, 2004 (the "Tri-Party Agreement").

25.    The Tri-Party Agreement recognizes in its second recital clause that SeaMiles is the "**creator**, owner, and operator of the SeaMiles cruise and travel rewards program" (emphasis added).

26.    Paragraph 19 of the Tri-Party Agreement creates a bilateral non-compete restriction whereby CCL and SeaMiles agreed that neither of them shall:

> during the Term of this Agreement (including any renewal term) **and for a period of one (1) year following the termination of this Agreement** for any reason whatsoever, offer any co-branded credit card product to any CCL-SeaMiles or SeaMiles Generic Card holders, provided that nothing herein shall be construed to prevent CCL or SeaMiles from offering the Program, another credit card product or credit card product related product or service **if the offer did not include credit card membership as a criteria** in selecting the recipients of the offer.

(emphasis added).

27.    Pursuant to this non-compete clause, upon termination of the Tri-Party Agreement, SeaMiles and CCL can offer a rewards card to their members, but the new card cannot be co-branded with a credit card and credit card membership cannot be part of the criteria of membership.

28.    Despite the Tri-Party Agreement, CCL was concerned about having the ability to

pursue other options should Juniper fail to properly support the program or, worse, try to circumvent CCL. Furthermore, SeaMiles agreed to share the revenues that it was receiving from Juniper with CCL in exchange for the exclusive protection of its SeaMiles Business Model and other intellectual property. As a result, on July 28, 2005, CCL and SeaMiles executed a separate Co-Branded Credit Card Agreement (the "Two-Party Agreement").

29.     The Two-Party Agreement, as between SeaMiles and CCL, incorporates and supersedes any inconsistent clauses in the Tri-Party Agreement (paragraph 2) and the NDA (paragraph 10.A).

30.     As in the Tri-Party Agreement, the Two-Party Agreement, at the very outset, recognizes SeaMiles' ownership of the SeaMiles Business Model and program:

> WHEREAS, SeaMiles is the owner and operator of credit card/travel rewards programs desiring to enter into an agreement with CCL to offer and issue a co-branded SeaMiles-CCL credit card to qualifying U.S. resident consumers through a credit card issuing bank (hereinafter, the "Program," and as more fully described in Section 1.A below)

31.     The Program is then further defined in the Two-Party Agreement as:

> Under the Program, approved Card applicants (the "Card Member(s)") will earn travel reward points ("Points") by charging purchases to the Card, or by making balance transfers or other approved transactions in connection with the Card. SeaMiles will enter into an agreement with Our Vacation Store, Inc. ("OVS" or the "Fulfillment Center") to serve as the travel fulfillment center to redeem cruises and other travel products in exchange for Card Member Points (the "Fulfillment Center Agreement"). Card Points shall be redeemable by Card Members in exchange for cruise vacations and other benefits, as mutually agreed upon by the Parties, subject to the Program's Card Points redemption platform ("Redemption Platform"), attached hereto as Exhibit C-1, attached and incorporated into this Agreement, as well as market and industry-related fluctuations.

32.     Paragraph 10.A of the Two-Party Agreement, which adopts the NDA, expands the coverage of the NDA by adding to the SeaMiles confidential information:

> all of its trade secrets, know-how, business strategies, marketing information, technical information, **Program concept and other**

> proprietary **information of SeaMiles, including account and business information, business planning**, operations and objectives, cost and processing information…

(emphasis added).

33.     A key term of the Two-Party Agreement was an acknowledgment by CCL in exchange for SeaMiles' promise to invest the capital required to make the CCL-SeaMiles co-branded card a success that the methodology, model and other elements of the program belonged exclusively to SeaMiles and could, therefore, not be appropriated by CCL. This was memorialized in paragraph 14 which states:

> Notwithstanding any other provision in this Agreement to the contrary, the SeaMiles' Marks and all intellectual property rights, software copyrights, operational documentation, website content and code, **business models**, trade dress, formulas, **methodology, revenue models**, and all other creative and **conceptual aspects of the Program** developed by SeaMiles **are and shall always be deemed the exclusive property of SeaMiles**, except to the extent any such materials, or creative or conceptual aspects of the Program include all or a portion of any CCL Mark.

(emphasis added).

34.     In order to effectuate the various agreements between the parties, SeaMiles, at its own expense, placed salespersons on the CCL ships. Room and board was not provided on a complimentary basis by CCL. In fact, SeaMiles bought guest cabins aboard the vessels for its salespeople to recruit customers for the program. In other words, SeaMiles paid for all expenses incurred in recruiting new SeaMiles customers aboard the CCL ships.

35.     These salespersons would explain the program to passengers, would prepare the necessary forms to enroll new members in the program, and would seek instant credit approval from Juniper for those passengers who applied.

36.     In addition, SeaMiles maintained an on-line site that promoted the program and signed up card holders.

37.     The SeaMiles card was a huge success.  During the following years, consumers rang up billions of dollars of sales on the co-branded card, resulting in over $100 million in revenues to the parties.

38.     In 2006 and 2007, problems surfaced when it was discovered that Juniper was:

    a.  Contacting other cruise lines regarding programs competitive with the SeaMiles Business Model in violation of the express and implied terms of the contracts between the parties.

    b.  Using the SeaMiles trademark and trade dress to promote the creation of competitive programs.

    c.  Shortchanging SeaMiles in its profit sharing calculation.

39.     The parties entered and continue a process of negotiation and discussion regarding these issues.  To this day, however, the profit sharing dispute remains unresolved.

40.     On December 1, 2007, Juniper, CCL and SeaMiles executed a Second Amendment to the Tri-Party Agreement.[2]   On December 7, 2007, Juniper and SeaMiles executed a Marketing Agreement.  These agreements came at the end of a year where SeaMiles almost sued Juniper for various contract violations involving improper discussions with third-parties as well money-related issues and where CCL participated with Juniper in violations of the exclusivity and confidentiality provisions of the Tri-Party Agreement.

41.     In May of 2009, SeaMiles learned that CCL was approaching SeaMiles' personnel aboard vessels and soliciting them to go work for CCL.

42.     SeaMiles demanded that CCL cease such conduct.

43.     On June 5, 2009, CCL notified Juniper and SeaMiles by a letter that was inexplicably dated June 12, 2009, that it intended to not renew the Tri-Party Agreement.

---

[2] The Tri-Party Agreement was first amended earlier, but that amendment is not relevant to the present controversy.

44.     On July 30, 2009, CCL sent SeaMiles a letter falsely claiming that SeaMiles was in default under the Two-Party Agreement.

45.     Over the following months, SeaMiles tried to work out a protocol for termination and transition which failed as it became increasingly obvious that CCL was planning to act in concert with Juniper and disregard SeaMiles' concerns.

46.     SeaMiles has recently discovered that on August 12, 2009, unbeknownst to SeaMiles, CCL registered the following Internet domain names:

> carnival-funpoints.com
> carnival-funpoints.net
> carnivalfun-points.com
> carnivalfun-points.net
> carnivalfunpoint.com
> carnivalfunpoint.net
> carnivalfunpoints.com
> carnivalfunpoints.net
> fun-points.com
> fun-points.net
> mycarnival-funpoints.com
> mycarnival-funpoints.net
> mycarnivalfunpoint.com
> mycarnivalfunpoint.net
> mycarnivalfunpoints.com
> mycarnivalfunpoints.net[3]

47.     On October 8, 2009, CCL sent SeaMiles a second letter wrongfully asserting breach by SeaMiles and informing SeaMiles that CCL had elected to terminate the Two-Party Agreement at the same time as the Tri-Party Agreement.

48.     The Tri-Party Agreement requires that a mutually agreed letter be sent to cardholders regarding termination. On or about October 9, 2009, CCL sent SeaMiles a proposed transition letter which showed that CCL and Juniper intended to appropriate to themselves all of the SeaMiles card holders, including those acquired exclusively by SeaMiles, to a new

---

[3]  CCL has previously used Funpoints to identify a program for groups and not a credit card related rewards program.

CCL/Juniper co-branded card.

49.     The proposed transition letter specifically stated:

On December 15, 2009, the relationship between Carnival and SeaMiles will end.  As a result, your current card will be replaced with a new Carnival MasterCard with FunPoints. This will be a seamless transition for you:

- Your **account number will remain the same**.

- Your **unredeemed SeaMiles will be automatically converted to FunPoints** on your new Carnival MasterCard

- You will continue to earn rewards on every purchase you make with your card.

Plus, with your new Carnival MasterCard, you will be able to redeem your FunPoints for cruises, onboard gifts and air travel... The possibilities are endless!

(emphasis added). In subsequent communications with each of CCL and Juniper, they have repeatedly stated their intention upon termination to send this new CCL/Juniper co-branded card to the SeaMiles cardholders.

50.     This specifically violates CCL's commitment to refrain from offering a co-branded credit card program for a period of a year after termination of the agreement.

51.     Moreover, this communication creates confusion in the minds of the consumer as to the card since it creates the impression that Defendants' new card is the same as the SeaMiles card using the same points, numbers and members and merely changing the names. By so doing, CCL and Juniper seek to steal the goodwill that the SeaMiles card has earned with the public.

52.     When SeaMiles reminded CCL and Juniper regarding their mutual obligations, counsel for Juniper indicated that he had been authorized by CCL to try to negotiate a solution between the parties.

53.     On numerous occasions, SeaMiles explained to CCL that this conduct was

11

unacceptable.

54.     CCL and Juniper have refused to abandon their plans.

55.     In particular, CCL and Juniper have confirmed that they intend to convert all Carnival SeaMiles account holders to a CCL co-branded card.

56.     CCL and Juniper have also indicated that they intend to solicit the full membership database including those customers acquired exclusively by SeaMiles.

57.     CCL has specifically refused to confirm that it will not steal the SeaMiles Business Model in violation of the Two-Party agreement and the NDA.

58.     Based on the Two-Party Agreement, CCL may not offer a co-branded travel reward card because that would violate SeaMiles' rights to the SeaMiles Business Model.

59.     CCL has also refused to commit to the destruction of all of the co-branded promotional materials used aboard its vessels even though the old co-branded card is no longer being actively promoted.

60.     Recently, SeaMiles discovered that Defendants are using the internet domain name www.carnivalseamiles.com to redirect consumers to Juniper's website located at the URL https://www.barclaycardus.com/app/ccsite/action/home.

61.     According to the public WHOIS database, the carnivalseamiles.com domain is owned and controlled by CCL.

62.     Once on the Juniper web site, CCL and Juniper promote Defendants' new Carnival "FunPoints" co-branded card in connection with a description of the current SeaMiles co-branded card, as shown below, thereby creating the impression in consumers' minds that it is a mere continuation of the SeaMiles program and that the programs are one and the same:

12





(Arrows not in original).

63.    CCL and Juniper's conduct described herein, if not enjoined will and would cause, unless restrained by the Court, irreparable injury and damage to SeaMiles and to the goodwill associated with SeaMiles' trademark, including diversion of customers from SeaMiles resulting in lost sales and lost profits, and the consequent unjust enrichment of CCL and Juniper. This injury and damage cannot be entirely quantified or compensated with a monetary award.

64.     Based on Defendants' prior representations, SeaMiles believes that CCL and Juniper will send, without SeaMiles required approval, a communication similar to the one above to SeaMiles cardholders within a matter of days in order to prepare to issue their new unauthorized cards on December 15.

65.     The fact that SeaMiles personnel are now removed or in the process of being removed from CCL's vessels, increases the risk that CCL will immediately start promoting the unauthorized card aboard its vessels.

66.     SeaMiles likewise believes that Juniper and CCL are likely to continue to engage in increasingly visible and material public steps in anticipation of the launch of their new unauthorized co-branded card, and that such steps will escalate within the coming days.

67.     SeaMiles knows that the unauthorized use of the carnivalseamiles.com domain to point at the web pages containing the images of the new unauthorized CCL/Juniper cards continues and is likely to continue, and believes that such use will escalate within the coming days.

68.     SeaMiles has retained the firm of Espinosa | Trueba PL to represent it in this action and is obligated to pay it a reasonable fee for their services.

Executed on November 4, 2009.

_____
Peter Rooney

14



EXHIBIT

*B*



**Carnival SeaMiles**
Next time cruise free. The Carnival SeaMiles MasterCard lets you earn SeaMiles toward a free cruise on Carnival-or any other cruise line-as well as vacations at quality resorts, air travel and much more.

